IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA,                )
                                          )
            Plaintiff,                    )
                                          )
      v.                                  )         2:71CV125
                                          )
ALAMANCE-BURLINGTON BOARD OF              )
EDUCATION (as successor-in-interest to    )
Burlington City Board of Education), et al., )
                                          )
            Defendants.                   )

## MEMORANDUM OPINION

This matter is before the Court on a Joint Motion for Dissolution of Court Orders and

Dismissal of the Action [Document #11] by the United States of America and the Alamance-

Burlington Board of Education (as successor-in-interest to the Burlington City Board of

Education).  In their Joint Motion, the parties request dissolution of this Court's July 13, 1971

Order adopting a plan for racial desegregation of the Burlington City Schools.  This Court held

a hearing on the Motion at which the parties presented evidence in support of their Motion.  In

addition, the parties agreed to provide additional supplemental information relevant to this

Court's review of their Motion.  The supplemental information has now been filed, and the

Motion is ready for review.

I.     FACTUAL BACKGROUND

The Burlington City Schools and Alamance County Schools previously operated as

separate school systems, and prior to 1963, both school systems operated a *de jure* system of

racially segregated schools.  After 1963, the school systems began to adopt "free choice" plans,

but many of the schools remained racially segregated.  By 1968, both systems had adopted

further measures to desegregate the schools based on geographic zoning, and the Alamance County School system reached an agreement with the Department of Health Education and Welfare ("HEW") to take additional agreed-upon steps to decrease the remaining racial disproportionality among the County schools. Therefore, HEW did not refer the Alamance County School system to the Department of Justice for legal proceedings, and the Alamance County School system continued to desegregate pursuant to the HEW agreement, but was not the subject of a court order. The HEW agreement called for the closing of an elementary school, discontinuance of intra-system transfers, and alteration of attendance zone lines for several elementary schools. In the HEW agreement, the parties projected that as a result of the plan, all of the County Schools would have a racially balanced enrollment of between 11% to 48% black students and 89% to 52% white students for 1971-72 school year.[1] The Office for Civil Rights ("OCR"), which was then part of HEW but is now part of the Department of Education, monitored compliance with the agreement.

In contrast, the Burlington City School system did not reach an initial agreement with HEW to address the remaining racial segregation in the City School system, particularly with respect to the operation of the Sellars-Gunn Elementary School. At that time, Sellars-Gunn was still being operated as a racially identifiable school, with a student population that was 100% black in 1968-69 and 98% black in 1969-70. For the 1970-71 school year, Sellars-Gunn had a student population that was 89% black, while four other elementary schools had black student

---

[1] Throughout this opinion, the Court has used the racial categories and student population summaries as collected and reported by the School System in the information submitted by the parties in support of the present Motion.

2

populations of only 4% to 6%. Because an agreement could not be reached to address this remaining racial segregation, HEW referred the Burlington City Schools to the Department of Justice, and the present lawsuit was filed alleging that the Burlington City Schools had failed to comply with the provisions of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq., and with the Fourteenth Amendment to the United States Constitution. The Burlington City Schools ultimately submitted a plan for desegregation that was approved by the Court in an Order dated July 13, 1971.

In the July 13, 1971 Order, the Court found that the Burlington City Board of Education had not been operating in compliance with the law as interpreted by the Supreme Court in Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S. Ct. 1267, 28 L. Ed. 2d 554 (1971), "in that the pupil enrollment of Sellars-Gunn Elementary School renders the same a racially identifiable school." See Order dated July 13, 1971; Swann, 402 U.S. at 26, 91 S. Ct. at 1281. Based on that finding, the Court approved a desegregation plan "to eliminate the racial identifiability of Sellars-Gunn Elementary School." Specifically, the approved plan provided that Sellars-Gunn would be operated as a junior high school for all ninth grade students in the City School system. Under the plan, eight schools (Eastlawn, Glenhope, Fisher Street, Forest Hill, Maple Avenue, Hillcrest, Grove Park and Smith) were designated as elementary schools for grades one through five, two schools (Turrentine and Broadview) were designated as middle schools for grades six through eight, one school (Sellars-Gunn) was designated as the junior high school for all ninth graders, and two schools (Williams and Cummings) were designated as high schools for grades ten through twelve. The approved plan also provided for adjustments in

3

attendance zones for several of the elementary schools and a "feeder" system from the elementary schools into the middle schools. At that time, the Burlington City Schools had an enrollment of 9,427 students, 21% of whom were black. In an Appendix to the plan, the parties projected that as a result of the plan, all of the Burlington City Schools would have a racially balanced enrollment of between 17% to 29% black students and 83% to 71% white students for the 1971-72 school year. After the Order was entered, this case was administratively closed, but the Court retained jurisdiction in the matter.

In 1996, the Burlington City Schools merged with the Alamance County Schools to form a single Alamance-Burlington School System (the "School System").[2] However, no further orders were entered in the present case, and the plan itself has not been dissolved or dismissed. In 2001, the Department of Justice undertook an examination of the Alamance-Burlington School System, as part of a general effort to review school systems that were still operating under court orders in cases in which the United States was a party. As part of this effort, the Department of Justice reviewed school policies and enrollment and employment statistics for the Alamance-Burlington Schools. Following the examination, the Alamance-Burlington School System agreed in 2003 to modify certain programs and provide annual information to the Justice Department for the next three years regarding racial composition of the students and faculty at each school, student transfer information, alterations to school attendance zones, special education programs, student discipline, and extracurricular activities. The Alamance-Burlington

---

[2] In light of the 1996 merger, the Alamance-Burlington Board of Education has been substituted for the Burlington City Board of Education in this case.

School System complied with the agreement, and in 2006, the Department of Justice concluded that the School System had complied with all plans that had been imposed, and that dismissal of this case was appropriate. The parties have now filed the present Motion seeking an order from this Court dissolving the desegregation plan previously entered for the Burlington City schools, and declaring the school system "unitary" and no longer subject to court-ordered desegregation. In support of the Joint Motion to dissolve the previous Court Order, the parties initially submitted a general summary of information to the Court, but the Court concluded that the matter could not be resolved summarily and that a hearing was necessary. At the hearing, the parties submitted significant additional information for the Court's consideration. In addition, during the course of the hearing, the Court determined that more additional information was needed. Therefore, the parties agreed to file supplemental information regarding various aspects of school operation and construction. That supplemental information has been filed, and the Joint Motion is now properly before the Court for review.

## II.    MOTION FOR DISSOLUTION OF COURT ORDER

In considering the Joint Motion for dissolution of the Court's prior Order and declaration of unitary status, the Court notes that "[d]issolving a desegregation decree after the local authorities have operated in compliance with it for a reasonable period of time properly recognizes that necessary concern for the important values of local control of public school systems dictates that a federal court's regulatory control of such systems not extend beyond the time required to remedy the effects of past intentional discrimination." Board of Educ. v. Dowell, 498 U.S. 237, 248, 111 S. Ct. 630, 637, 112 L. Ed. 2d 715 (1991) (internal quotation

omitted). Under existing law, "a school system must be declared unitary when it no longer discriminates between children on the basis of race." Belk v. Charlotte-Mecklenburg Bd. of Educ., 269 F.3d 305, 318 (4th Cir. 2001). Making the determination that a school district has complied with a prior desegregation order and is now "unitary" is a fact-intensive inquiry, and "[t]he burden of proof falls on the party seeking an end to court supervision." Id. "In undertaking a unitary status inquiry, a court must ask 'whether the Board has complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination have been eliminated to the extent practicable.'" Belk, 269 F.3d at 318 (quoting Dowell, 498 U.S. at 249-50, 111 S. Ct. at 638 (1991)). This ordinarily would include consideration of "'student assignment, faculty assignment, facilities and resources, transportation, staff assignment, and extracurricular activities.'" Belk, 269 F.3d at 318 (citing Green v. County School Bd., 391 U.S. 430, 435, 88 S. Ct. 1689, 1693, 20 L. Ed. 2d 716 (1968)).

Under this standard, the first step in undertaking a unitary status inquiry is whether the School System has fully and satisfactorily complied in good faith with the Court's decree since it has been entered. In the present case, the Court's original decree specifically addressed only Sellars-Gunn Elementary School, which was still being operated as a racially identifiable school, with a roughly 90% black student enrollment. The Court's decree found that Sellars-Gunn was a racially identifiable school being operated in violation of the Fourteenth Amendment, and the Court approved the School's plan for desegregating Sellars-Gunn by converting the school to a junior high school housing all ninth grade students in the district beginning in the 1971-72 school year. The School System has presented evidence to show compliance with the order

6

requiring desegregation of Sellars-Gunn, as well as general good faith in complying with the Court-ordered desegregation of the school system. Specifically, the School System has presented evidence to establish that consistent with the Court's Order, Sellars-Gunn operated as a junior high school for all ninth grade students in the City School system from 1972 through 1982, during which time black student enrollment at the school never exceeded 30 percent. However, Sellars-Gunn was closed in 1982, and the ninth graders were moved to the two high schools, Cummings High and Williams High. The racial balance that had existed at Sellars-Gunn was generally maintained at both high schools after the transition, with a student population in 1984 of 37% black and 62% white at Cummings and 23% black and 76% white at Williams. Sellars-Gunn subsequently reopened in 1995 as an alternative education center, and presently houses several of the school system's alternative education programs, including a Career-Technical Education program and a voluntary program for students suspended for more than 10 days from other Alamance-Burlington Schools. Based on this presentation, it appears that the School System complied with the Court's Order specifically requiring desegregation of Sellars-Gunn. However, because the larger purpose of the Court's Order was to address the continued maintenance of a racially identifiable school and to eliminate the vestiges of *de jure* segregation, the Court must now consider generally whether the School System has demonstrated a good faith commitment to the whole of the Court's decrees and to those provisions of the law and the Constitution that were the predicate for judicial intervention, and whether the vestiges of past discrimination have been eliminated to the extent practicable. Cf. Belk, 269 F.3d at 334 (noting that where changes in the school district may have rendered the court's previous specific

7

order obsolete, "a district court must look beyond mere compliance with the original decree and ask whether the vestiges of the dual system have been eliminated to the extent practicable."). The Court considers this to be a task of utmost importance, particularly in light of the information presented regarding the present racial balances that exist within the School System, as hereinafter discussed.

With respect to whether the vestiges of past discrimination have been eliminated to the extent practicable, the Court must presently take into consideration factors addressing (a) student assignment, including racial composition of each school, the use of school siting to foster integration, and the use of student transfers; (b) faculty assignment; (c) facilities and resources; (d) transportation; (e) staff assignment; (f) extracurricular activities; and (g) ancillary factors, such as teacher quality, student achievement, and student discipline. See Green, 391 U.S. at 435, 88 S. Ct. at 1693; Freeman v. Pitts, 503 U.S. 467, 492, 112 S. Ct. 1430, 1446, 118 L. Ed. 2d 108 (1992). The beginning point in this analysis is student assignment and the existence of any racial imbalance in the student populations. "Student assignment is perhaps the most critical Green factor because state-mandated separation of pupils on the basis of race is the essence of the dual system." Belk, 269 F.3d at 319. However, "[t]he constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole." Swann, 402 U.S. at 24, 91 S. Ct. at 1280. In addition, the Supreme Court has held that "[o]nce the original racial imbalance caused by a constitutional violation has been rectified, 'the school district is under no duty to remedy imbalance that is caused by demographic factors.'" Belk, 269 F.3d at 321 (quoting Freeman, 503

8

U.S. at 494, 112 S. Ct. at 1447). Thus, if there are current disparities in the student assignments and racial balance of the schools, the School System may nevertheless be able to demonstrate that these disparities are the result of socioeconomic factors, demographic factors, geographic factors, or other neutral factors and are not the vestiges of past *de jure* segregation. See Freeman, 503 U.S. at 494, 112 S. Ct. at 1447. In this regard, the Supreme Court has held that "[w]here resegregation is a product not of state action but of private choices, it does not have constitutional implications," Freeman, 503 U.S. at 495, 112 S. Ct. at 1448, and the Fourth Circuit has noted that "the Supreme Court made clear in Freeman that the affirmative measures mandated by Green are not meant to remedy 'private choices' that lead to resegregation." Belk, 269 F.3d at 324.[3] However, given the existence of the prior *de jure* system, the Court begins with the initial presumption that any racial imbalances are a vestige of past segregation, and the burden is on the School System to show that the existence of any predominantly one-race schools "is not the result of present or past discriminatory action on their part." See Swann, 402

---

[3] The Court notes that the Supreme Court's rulings in this area have been the subject of criticism and debate, including among members of the Supreme Court itself, particularly with respect to the potential reemergence of racially isolated schools in many public school systems. See, e.g., Dowell, 498 U.S. at 251, 257, 263, 111 S. Ct. at 639, 642, 645 (Marshall, J., dissenting) (contending that the majority opinion "fails to recognize explicitly the threatened reemergence of one-race schools as a relevant 'vestige' of *de jure* segregation" and that "a standard for dissolution of a desegregation decree must take into account the unique harm associated with a system of racially identifiable schools and must expressly demand the elimination of such schools" because "the persistence of racially identifiable schools perpetuates the message of racial inferiority associated with segregation"); see also Erwin Chemerinsky, The Segregation and Resegregation of American Public Education: The Court's Role, 81 N.C. L. Rev. 1597 (2003). However, this Court must apply the law as it presently exists, and will therefore consider not only the existence of any present racial imbalance in the System's schools, but also whether the School System has shown that the imbalance is the result of other demographic or geographic factors, and not a vestige of the prior *de jure* system.

U.S. at 26, 91 S. Ct. at 1281.

In the present case, the new data presented by the parties demonstrates that the Burlington City School System achieved significant racial balance in student assignments during the time period from 1972 through 1996. During this time period, the overall percentage of black students in the Burlington City Schools increased from 23% in 1972 to 39% in 1996, and the percentage of black students at each of the City Schools ranged from 8% to 49% during this time period.[4] Thus, for the years from 1972 to 1996, none of the City Schools had a majority of black students. Some schools within the School System also enrolled a few Hispanic students, but prior to 1990, all of the City schools had white student populations of over 50%. Beginning in 1990, the number of Hispanic students in the City Schools increased slightly, but all of the City schools still had a white student population of between 48% and 75%. In addition, the School System has also demonstrated that from 1976 through 1996, all of the Burlington City Schools maintained student populations with a percentage of black students within 20 points above or below the overall percentage of black students in the school system. Cf. Belk, 269 F.3d at 319 (considering racial balance in student assignments based on a "plus 15%" or "plus 20%" variance from the district-wide average). Moreover, although the Alamance County System was not the subject of a court order, the Alamance County System also achieved significant racial balance during this period. In the Alamance County Schools, the overall percentage of black students in the County Schools was 23% in 1972, decreasing to 19% in 1992. During this time,

---

[4] This summary excludes the Extended Day School, which had less than 40 students and which had a black student population ranging from 48% to 55%.

only one of the County's schools had a student population with a percentage of black students more than 20 points above or below the overall percentage of black students in the school system, which was Pleasant Grove Elementary, with a black student population ranging from 50% to 55% from 1972 to 1992.

The two school systems merged in 1996, and from 1998 to 2008 the overall percentage of black students in the School System ranged from 28% in 1998 to 23% in 2008. During the period from 1998 to 2008, two changes occurred with respect to the racial balance of the schools. First, several of the schools became less racially balanced, with the percentage of black students increasing to over 50% at several schools, and with increasing concentrations of white students at several other schools, particularly in outlying residential areas. Second, the number of Hispanic students in the School System increased significantly, changing the overall racial composition for the School System by 2007 to 16% Hispanic, 23% black, 55% white, and 4% multi-racial. These changes can be seen in the distribution of students among the six high schools in the merged School System. By 2007, three of the six high schools had a large concentration of white students, including two high schools with student populations over 80% white (Southern Alamance and Western Alamance), and one with a student population over 70% white (Eastern Alamance). In contrast, one of the high schools (Cummings) had a student population of 11% white, 57% black and 28% Hispanic. The other former City high school (Williams) had a student population of 49% white, 34% black, and 11% Hispanic, and another high school (Graham) had a student population of 38% white, 33% black and 23% Hispanic. Similar shifts occurred in the middle schools and elementary schools. Thus, after achieving a

11

greater degree of integration through 1996, the Court's attention is drawn to the fact that schools in the Alamance-Burlington System have gradually become less racially balanced in the last 10 years. As noted above, where racial imbalance presently exists, the School System has the burden to demonstrate that the imbalance resulted from socioeconomic factors, demographic factors, geographic factors, or other neutral factors, rather than as a vestige of the prior discriminatory system.

In considering this determination in the present case, it is notable that when the City and County school systems merged in 1996, school officials did not draw new attendance zones. Aware of their obligations under this Court's prior desegregation Order, as well as the desegregation plan approved by HEW, the School System did not modify attendance zones except on limited occasions to accommodate new schools. Since the merger, the School System has opened three new schools: Garrett Elementary School (2000), Hawfields Middle School (2001) and Highland Elementary School (2007). The evidence presented establishes that the locations for these new schools were chosen to accommodate student population growth in those areas. Specifically, Hawfields and Garrett were located in the far eastern portion of the County, to accommodate population growth in the Mebane area, and did not affect any of the former City Schools. In addition, the School System has noted that in 2007, the student population at Garrett was 12% black, 14% Hispanic, 6% multi-racial, and 68% white, which is close to the overall student population for the School System, and none of the elementary schools surrounding Garrett experienced any significant changes in racial composition as a result of the alteration of attendance zones after Garrett opened. Similarly as to Hawfields Middle

12

School, the student population there in 2008 was 16% black, 12% Hispanic, 4% multi-racial, and 67% white, and the racial composition of the only other middle school in that area of the County, Woodlawn Middle, was not affected by the alteration of attendance zone and opening of Hawfields. Finally, with respect to Highland Elementary, this school was opened in 2007 in the western part of the County as a result of student population growth in that area. The attendance zones of Elon College Elementary, E.M. Holt Elementary, and Marvin B. Smith Elementary were all affected by the opening of Highland. The evidence presented by the School System indicates that in drawing attendance zones and choosing the location for Highland, the School Board primarily considered school capacity and minimizing transportation burdens. The School Board also considered a plan that focused on increasing racial diversity, but this plan would have required satellite attendance areas and significant transportation burdens and therefore was not chosen. Ultimately, the resulting racial composition of Highland in 2007 became 13% black, 6% Hispanic, 3% Asian, 5% multi-racial, and 70% white. The redrawing of attendance lines for the nearby elementary schools to accommodate the opening of Highland did not significantly change the racial composition of those nearby schools. Specifically, after Highland opened, the black student population increased at Elon College Elementary from 9% to 13%, increased at Smith Elementary from 19% to 20%, and remained at 4% at Holt Elementary. Thus, it appears that the limited construction and redrawing of attendance lines that has occurred in recent years has been designed to address student population growth and maintain the existing racial balance at the schools, and the racial composition of the newly constructed schools closely mirrors the racial composition of the student population across the

School System. It does not appear that the new schools were sited to foster segregation. Instead, it appears that the School System made efforts to design construction to meet overcrowding and student growth but still with efforts to improve and maintain racial balance as well as possible.

Based on the evidence presented with respect to student assignments and student populations at each of the schools, the Court concludes that the School System did achieve a level of racial balance consistent with their good faith efforts to comply with the purposes of the desegregation orders, and maintained that racial balance for over 20 years. Nevertheless, the Court is cognizant of the fact that the racial imbalance has increased at some of the schools in the past 10 years. However, the Court is compelled to find that these trends are attributable to demographic changes, particularly the large influx of Hispanic students into the School System, as well as the shift of many white students to residential areas farther outside the City. Under these circumstances, the Court further concludes that any racial imbalance over the last 10 years is not the result of any past or present racial discrimination by the School System. With respect to new school sitings, the Court finds that any school construction or redrawing of attendance lines was designed to address population growth and school overcrowding, and did not contribute to present racial imbalances. Thus, as in <u>Belk</u>, "[t]he imbalance existing in some schools is not traceable to the former dual system or to renewed discriminatory actions, but rather is a result of growth and shifting demographics." <u>Belk</u>, 269 F.3d at 326. Under the Supreme Court's rules in <u>Freeman</u> and <u>Dowell</u>, as discussed above, this Court cannot require the School System to maintain ongoing racial balancing to correct for these demographic

14

changes.  As such, in consideration of this single factor, the Court concludes that any racial imbalance in student assignments that has resulted from shifting demographic patterns alone would not preclude a unitary status determination as requested by the parties.

In addition to considering student assignments, which is the most critical <u>Green</u> factor, the Court has also considered the other <u>Green</u> factors to determine whether the vestiges of past discrimination have been eliminated to the extent practicable.  With respect to faculty assignments, the Court notes that even in 1970, prior to the entry of the Court Order in this case, the assignment of faculty in the Burlington City School system was no longer segregated, and black faculty members were assigned in relatively balanced percentages across all of the City schools.  Similarly, in 2005, 9% of the School System's teachers were black, and those teachers were assigned across the school system, with most schools having a teacher population of between 0% and 24% black.  Only Broadview Middle School and the alternative education center at Sellars-Gunn were outside this range, where 38% of the teachers at Broadview were black, and 36% of the teachers at Sellars-Gunn were black.  There is no evidence that the School System presently assigns black teachers to predominantly black schools and white teachers to predominantly white schools.  Cummings High School, which has experienced some increasing imbalance in the student population as discussed above, has a teacher population that is 22% black and 73% white. The School System noted at the hearing before this Court that it has continued various efforts to recruit and retain black teachers, and it appears that the vestiges of past discrimination have been eliminated to the extent practicable with respect to faculty assignments. The same is true for staff assignments, which are also made without regard to race,

15

and which do not reflect any vestiges of the prior *de jure* system.

With respect to the physical facilities, it is notable that to the extent some racial imbalance currently exists, many of the schools that now have a higher percentage of black students are actually the newest schools that were previously majority white schools under the prior *de jure* system. For example, Cummings High School, which is the high school with the highest percentage of black students, is the newest high school in the School System and has larger classrooms than the other high schools. In contrast, Western Alamance High School, which has the highest percentage of white students, is older and not fully air-conditioned, and has smaller classrooms than Cummings. The newer elementary and middle schools that have been built recently have a racial balance similar to the population as a whole, as discussed above, and were designed to address overcrowding and population growth while maintaining the existing racial balance to the extent possible. At the hearing before this Court, the School System noted that the facilities with the highest percentage of white students are generally the oldest facilities and most overcrowded, requiring temporary classrooms and large class sizes. Therefore, the Court concludes that to the extent some racial imbalance currently exists, the schools that have become imbalanced do not necessarily have inferior physical facilities, and any disparity as to the conditions of the facilities was not directly caused by intentional discrimination and was not a vestige of prior *de jure* system.

The Court similarly concludes that no vestiges of the prior *de jure* system remain with respect to transportation, which is provided on an equal basis to any student who does not live within a mile and a half of their school, or with respect to extracurricular activities, which are

available to all students regardless of race and which are offered at all schools including those that have become less racially balanced in recent years. With respect to the ancillary factor of student discipline, the Court notes that while a higher percentage of black students have been subject to discipline, there is no evidence that black students are disproportionately targeted for discipline. Cf. Belk, 269 F.3d at 332. In order to monitor the concerns raised as to this factor, the School System has followed the recommendations of the Department of Justice to track discipline rates and ensure that discipline is administered in a fair and nondiscriminatory manner, including through training faculty and the use of corrective action plans if necessary. Likewise, the School System has adopted measures to track referrals to the Gifted and Talented programs and Special Education programs, to ensure that any racial disparity in these areas can be identified and addressed. Therefore, the Court concludes that any disparities in these areas are being addressed by the School System and are not a vestige of the prior *de jure* system.

Finally, with respect to the ancillary factor of student achievement, the Court expressed some concern to the parties that not only have some schools experienced increasing racial imbalance in the past ten years, but those schools with higher percentages of black and Hispanic students suffer from lower graduation and achievement rates than other schools in the School System. At the hearing before this Court, the School System acknowledged this concern and discussed the various efforts being made to address this problem. Having considered these efforts and all of the evidence presented, the Court concludes that any achievement gaps that may presently exist are not a vestige of the prior dual system. In particular, the Court notes that the schools were racially balanced for 20 years, and to the extent some racial imbalance now

17

exists, the Court finds that the School System has taken significant steps to provide extra opportunities and support for students at the schools that have trended toward racially imbalanced. In addition, the Court finds that the disparity in graduation and achievement rates is due primarily to socioeconomic factors and not any disclosed School System policy or any past or present racial discrimination. The Court recognizes that many commentators have noted that the achievement gap that exists among increasingly racially imbalanced schools is troubling as a matter of educational and social policy. See Parents Involved in Community Sch. v. Seattle Sch. Dist. No. 1, 551 U.S. 701, 127 S. Ct. 2738, 2820-22, 168 L. Ed. 2d 508 (2007) (Breyer, J., dissenting) (reviewing various studies regarding the achievement gap in racially isolated schools); see also, e.g., Symposium: The Resegregation of Southern Schools? A Crucial Moment in the History (and the Future) of Public Schooling in America, 81 N.C. L. Rev. 1375 et seq. (2003). As discussed below, the School System can continue to address these concerns even after the desegregation order is dissolved. However, as part of the present inquiry, the Court's review is limited to a consideration of whether the achievement gap is due to past or present racially discriminatory policies, or is instead due to other factors. The Fourth Circuit has held that where an achievement gap is linked to other factors, and is not a result of the former *de jure* system, "it is beyond the reach of the court's authority." Belk, 269 F.3d at 330-31. In this regard, the School System has presented evidence to establish that the disparity is not a vestige of past discrimination or evidence of present discrimination, and these concerns are therefore beyond the scope of the Court's prior desegregation order, and would not preclude a unitary status determination.

18

Having considered all of the evidence presented in light of the <u>Green</u> factors, the Court concludes that under current Supreme Court and Fourth Circuit precedent, the prior dual system has been dismantled and the vestiges of prior discrimination have been eliminated to the extent required under existing law. Such a finding does not preclude the Court from recognizing that the School System continues to face many difficulties, including limited resources and facilities and increasing racial imbalance in some schools. The Court is compelled to find, however, under the facts presented and under the law as it presently exists, that any difficulties or disparities that exist within the School System are not a vestige of the former *de jure* system and do not reflect any present racial discrimination by the School System.

Having so concluded, the Court must, as a final matter, consider whether the School System has demonstrated a good faith commitment to the whole of the Court's decrees and to those provisions of the law and the Constitution that were the predicate for the initial judicial intervention. Based on the evidence presented, the Court concludes that the Alamance-Burlington School System, and prior to the merger the separate Alamance County and Burlington City Systems, did in fact demonstrate a good faith commitment to comply with this Court's Order and the agreement with HEW, and have thereafter shown a good faith commitment to eliminate racial discrimination, maintain racial balance within the schools, and address any achievement gaps or disparities that subsequently develop. Based on the record, the Court concludes that the School System is committed to diversity and to providing equal educational opportunities to all students, and appears to be unlikely to revert to an intentionally discriminatory system. Therefore, the Court will find that the School System is no longer

operating an intentionally discriminatory dual system, and is instead operating a unitary system. As a result, the Court's prior desegregation order will be dissolved, and this Court will no longer maintain oversight over the School System's operations.

The Court notes, however, that the School System should remain committed to maintaining an integrated school system, without black schools or white schools, "just schools." Green, 391 U.S. at 442, 88 S. Ct. at 1696. In this regard, the Fourth Circuit has held that "[a] finding of unitariness brings a fresh start for the school board - an opportunity to operate a school system in compliance with the Constitution." Belk, 269 F.3d at 347. Under the mandates of the Supreme Court, as the School System moves forward in an attempt to operate its school system "in compliance with the Constitution," any future consideration of race or racial classifications by the School System must be narrowly tailored to meet a compelling government interest. See Seattle Schools, 127 S. Ct. at 2751-52.[5] However, pursuant to Justice Kennedy's concurring opinion in Seattle Schools, racial diversity remains a compelling government interest that the School System may pursue, and "[a] compelling interest exists in

---

[5] The Court notes that the issues raised in the Seattle Schools decision have been the subject of intense debate, as set out best by the dissenting justices in that case. See Seattle Schools, 127 S. Ct. at 2797-2800 (Stevens, J., dissenting); 127 S. Ct. at 2800-42 (Breyer, J., dissenting). However, the decision, at least as to those portions receiving a majority of votes, is binding on this Court and on the School System. The Court notes, though, that Chief Justice Roberts' opinion in Seattle Schools was fully joined by only three other Justices (Justices Scalia, Thomas, and Alito), with Justice Kennedy filing a separate opinion concurring on narrower grounds. "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." Marks v. United States, 430 U.S. 188, 193, 97 S. Ct. 990, 51 L. Ed. 2d 260 (1977) (internal quotation omitted). Therefore, this Court has relied on the concurring opinion of Justice Kennedy, as discussed above, in setting out the framework governing the School System going forward.

avoiding racial isolation, an interest that a school district, in its discretion and expertise, may choose to pursue." See Seattle Schools, 127 S. Ct. at 2791, 2797 (Kennedy, J., concurring). Thus, as set out in Justice Kennedy's concurrence in Seattle Schools, the Constitution does not require school districts to "ignore the problem of de facto resegregation in schooling" and does not mandate that "state and local school authorities must accept the status quo of racial isolation in schools." Id. at 2791 (Kennedy, J., concurring). Therefore, "[i]n the administration of public schools by the state and local authorities it is permissible to consider the racial makeup of schools and to adopt general policies to encourage a diverse student body, one aspect of which is its racial composition. . . . If school authorities are concerned that the student-body compositions of certain schools interfere with the objective of offering an equal educational opportunity to all of their students, they are free to devise race-conscious measures to address the problem in a general way and without treating each student in different fashion solely on the basis of a systematic, individual typing by race. School boards may pursue the goal of bringing together students of diverse backgrounds and races through other means, including strategic site selection of new schools; drawing attendance zones with general recognition of the demographics of neighborhoods; allocating resources for special programs; recruiting students and faculty in a targeted fashion; and tracking enrollments, performance, and other statistics by race." Seattle Schools, 127 S. Ct. at 2792 (Kennedy, J., concurring). In addition, the School System may consider non-racial classifications, such as socioeconomic factors and achievement levels, in order to diversify the student populations generally. Finally, the School System can and should direct resources and set policies to address the declining levels of student achievement

21

at the schools that have experienced increasing racial imbalance in recent years, addressing these issues as matters of educational policy even after this Court's judicial oversight in the present case is lifted.

Moreover, although the School System will not be operating under any Court orders or oversight, the fact should not be ignored that any future actions by the School System that should operate to discriminate against students on the basis of race could form the basis of a separate legal action in the future. Based on the information presented, however, the Court concludes that the School System has complied in good faith with the prior desegregation orders and agreements, and has eliminated the vestiges of the prior *de jure* discrimination to the extent practicable under existing law and now operates a unitary school system. Therefore, the Court will close this chapter in this history of the Burlington Schools, but with the expectation that the School System will continue to act in good faith to ensure that the prior discriminatory system is not allowed to resurface, and that all students in the School System will have equal access to high quality educational opportunities.

IT IS THEREFORE ORDERED that this Court's Order of July 13, 1971, and any other Orders previously entered in this action, will be DISSOLVED, and the Alamance-Burlington Board will be relieved from any obligations thereunder.

An Order and Judgment consistent with this Memorandum Opinion will be entered contemporaneously herewith.

This, the 15th day of July, 2009.

_____
United States District Judge